No. 24-11060

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

RICKY JOHNSON,

*Plaintiff-Appellant*,

v.

KEVIN MARLER,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the
Middle District of Georgia, Macon Division,
No. 5:16-cv-00453-TES-MSH

_____

### BRIEF FOR APPELLANT
_____

MANOJ S. VARGHESE
JEFFREY W. CHEN
AMANDA D. BRADLEY
BONDURANT MIXSON &
ELMORE, LLP
1201 West Peachtree Street N.W.
Suite 3900
Atlanta, GA 30309
(404) 881-4100

KASDIN M. MITCHELL
JORDAN L. GREENE
 *Counsel of Record*
GABRIELLE DURLING
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
jordan.greene@kirkland.com

*Counsel for Plaintiff-Appellant*

July 11, 2024

*Johnson v. Marler*, No. 24-11060

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Plaintiff-Appellant Ricky J. Johnson certifies that the following Certificate of Interested Persons and Corporate Disclosure Statement lists the trial judges(s), attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, and parent corporations.

1.  Alvarado, Donna M. - Member of Board of Directors for CoreCivic, Inc.

2.  Bradley, Amanda D. - Counsel for Plaintiff-Appellant Ricky Johnson

3.  Barrow, Donald

4.  Bondurant Mixson & Elmore LLP - Counsel for Plaintiff-Appellant Ricky Johnson

5.  Brooks, J. Kyle - Counsel for Defendant Sharon Lewis, Defendant Thomas Ferrell, and Glen Johnson

6.  Butler Snow LLP - Counsel for Defendant-Appellee Kevin Marler and Melody Turner

7.  Carr, Christopher M. - Counsel for Defendant Sharon Lewis, Defendant Thomas Ferrell, and Glen Johnson

8.  Carter, Allen

*Johnson v. Marler*, No. 24-11060

9.     Chalmers, Roger A. - Counsel for Defendant Sharon Lewis, Defendant

Thomas Ferrell, and Glen Johnson

10.    Chaudhary, Ayaz

11.    Chen, Jeffrey W. - Counsel for Plaintiff-Appellant Ricky Johnson

12.    CoreCivic, Inc. - Employer and/or former employer of Defendant-Appellee

Kevin Marler and Melody Turner. *CoreCivic, Inc. is a successor*

*corporation by name change of Corrections Corporation of America.*

***CoreCivic, Inc. is a publicly traded company using the symbol CXW on the***

***New York Stock Exchange.***

13.    Cuismano, Ellen - Counsel for Defendant Sharon Lewis, Defendant Thomas

Ferrell, and Glen Johnson

14.    Dennis, Robert J. - Member of Board of Directors for CoreCivic, Inc.

15.    DiStanislao, Phillip Thomas - Counsel for Defendant-Appellee Kevin Marler

16.    Durling, Gabrielle - Counsel for Plaintiff-Appellant Ricky Johnson

17.    Emkes, Mark A. - Chairman of Board of Directors for CoreCivic, Inc.

18.    Ferrell, Joy – Personal Representative of The Estate of Thomas Ferrell,

Defendant

19.    Ferrell, Thomas - Defendant

20.    Greene, Jordan L. - Counsel for Plaintiff-Appellant Ricky Johnson

21.    Hart, Derrell James

*Johnson v. Marler*, No. 24-11060

22. Hininger, Damon T. - Member of Board of Directors for CoreCivic, Inc.

23. Hylton, Stacia - Member of Board of Directors for CoreCivic, Inc.

24. Hyles, Hon. M. Stephen - United States Magistrate Judge

25. Johnson, Glen

26. Johnson, Ricky - Plaintiff-Appellant

27. Kirkland & Ellis LLP - Counsel for Plaintiff-Appellant Ricky J. Johnson

28. Lappin, Harley G. - Member of Board of Directors for CoreCivic, Inc.

29. Lewis, E. Righton J. - Counsel for Defendant-Appellee Kevin Marler and Melody Turner

30. Lewis, Sharon - Defendant

31. Mariucci, Anne L. - Member of Board of Directors for CoreCivic, Inc.

32. Marler, Kevin - Defendant-Appellee

33. Marshall, Thurgood Jr. - Member of Board of Directors of CoreCivic, Inc.

34. McKinnon, Constance L. - Counsel for Plaintiff-Appellant Ricky Johnson

35. Merriam, Darina - Counsel for Plaintiff-Appellant Ricky Johnson

36. Mitchell, Kasdin M. - Counsel for Plaintiff-Appellant Ricky Johnson

37. Mohammad

38. Montgomery, Lemuel E. - Counsel for Defendant-Appellee Kevin Marler

39. Moore, Christi R. - Counsel for Defendant-Appellee Kevin Marler

40. Morris, Anna Little - Counsel for Defendant-Appellee Kevin Marler

*Johnson v. Marler*, No. 24-11060

41.  Murphy, Devin - Member of Board of Directors for CoreCivic, Inc.

42.  Overby, Charles L. - Member of Board of Directors for CoreCivic, Inc.

43.  Pacious, Kathleen M. - Counsel for Defendant Sharon Lewis, Defendant
     Thomas Ferrell, and Glen Johnson

44.  Prann, John R. Jr. - Member of Board of Directors for CoreCivic, Inc.

45.  Pinson, Andrew - Counsel for Defendant Sharon Lewis, Defendant Thomas
     Ferrell, and Glen Johnson

46.  Rajavuori, Derek S. - Counsel for Defendant-Appellee Kevin Marler and
     Melody Turner

47.  Self, Hon. Tilman III - United States District Judge

48.  Stay, Ronald J. - Counsel for Defendant Sharon Lewis, Defendant Thomas
     Ferrell, and Glen Johnson

49.  Tatum, Clayton

50.  Toole, Thomas Robert

51.  Turner, Melody

52.  Varghese, Manoj S. - Counsel for Plaintiff-Appellant Ricky Johnson

53.  Waller, Nia Nzinga - Counsel for Defendants Sharon Lewis and Thomas
     Ferrell

54.  Ward, Timothy C. - Commissioner of the Georgia Department of
     Corrections

*Johnson v. Marler*, No. 24-11060

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-3(b), Plaintiff-Appellant Ricky J. Johnson

certifies that, aside from CoreCivic, Inc., no publicly traded company or corporation

has an interest in the outcome of this case.

July 11, 2024

*/s/* Jordan L. Greene
Jordan L. Greene

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Ricky Johnson requests oral argument. The principal question in this appeal is whether an administrative grievance lodged at one state prison can satisfy the Prison Litigation Reform Act's exhaustion requirement with respect to the exact same issue at a different prison within the same system. This question has divided the district courts in this Circuit, with the Northern District of Florida having held that a prisoner's grievance addressing one issue satisfied the exhaustion requirement with respect to a functionally identical issue at a different institution in *Johnson v. Florida Department of Corrections*, 826 F. Supp. 2d 1319 (N.D. Fla. 2011), and the Middle District of Georgia having reached the opposite conclusion in this case and in *Diamond v. Owens*, 131 F. Supp. 3d 1346 (M.D. Ga. 2015). Johnson respectfully submits that oral argument would assist the Court in resolving this question of federal law that has divided district courts.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION..........................................................4

STATEMENT OF THE ISSUES................................................................4

STATEMENT OF THE CASE ...................................................................5

    I.    Legal Background ..................................................................5

    II.    Factual Background................................................................7

           A.    Johnson Grieves The Failure To Treat His Hepatitis C.............7

           B.    Dr. Marler Continues To Deny Treatment................................8

    III.    Procedural History...............................................................11

SUMMARY OF THE ARGUMENT ........................................................15

STANDARD OF REVIEW ......................................................................18

ARGUMENT ..........................................................................................19

    I.    Johnson's Pre-Suit Grievance Exhausted His Administrative Remedies. ............................................................................19

           A.    Johnson's Complaint Against Dr. Marler Concerned The Same Issue That He Raised In His Pre-Suit Grievance...........19

           B.    The District Court Imposed New Requirements Not Present In Either The PLRA Or GDC's Policies.....................29

           C.    Johnson Was Not Required To Put Dr. Marler "On Notice." .................................................................................36

    II.    The District Court Abused Its Discretion By Granting Dr. Marler's Motion For Leave Based On An Erroneous Understanding of Rule 12(c)................................................38

CONCLUSION ......................................................................................45

# TABLE OF AUTHORITIES[*]

**Cases**

*Booth v. Churner*,
    532 U.S. 731 (2001)............................................................29

*\*Brown v. Sikes*,
    212 F.3d 1205 (11th Cir. 2000) ....................................*passim*

*Christmas v. Corizon Health Servs.*,
    2021 WL 1821537 (M.D. Fla. Mar. 29, 2021) ......................42

*Chudasama v. Mazda Motor Corp.*,
    123 F.3d 1353 (11th Cir. 1997) ...........................................39

*Clinton v. Jones*,
    520 U.S. 681 (1997)............................................................39

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)......................................................19, 41

*Diamond v. Owens*,
    131 F. Supp. 3d 1346 (M.D. Ga. 2015) ..................................i

*Dietz v. Bouldin*,
    579 U.S. 40 (2016)..............................................................39

*Dimanche v. Brown*,
    783 F.3d 1204 (11th Cir. 2015) ...........................................18

*Dixon v. United States*,
    548 U.S. 1 (2006)................................................................18

*Fair Isaac Corp. v. Fed. Ins.*,
    2022 WL 1537957 (D. Minn. May 16, 2022) ......................43

*Gall v. United States*,
    552 U.S. 38 (2007)..............................................................44

---

[*] Citations upon which Appellant primarily relies are marked with asterisks.

iii

*Goebert v. Lee County*,
    510 F.3d 1312 (11th Cir. 2007) ...........................................................34

*Hallmark Ins. v. Fannin*,
    2018 WL 8929809 (N.D. Ga. Apr. 13, 2018)......................................40

*Howard v. Waide*,
    534 F.3d 1227 (10th Cir. 2008) ...................................................24, 25

*\*Johnson v. Fla. Dep't of Corr.*,
    826 F. Supp. 2d 1319 (N.D. Fla. 2011) ............................ i, 34, 37, 38

*Johnson v. Johnson*,
    385 F.3d 503 (5th Cir. 2004) ..............................................................25

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012) .........................................................26, 27

*Johnson v. Lewis*,
    83 F.4th 1319 (11th Cir. 2023) ..............................................13, 21, 23

*\*Jones v. Bock*,
    549 U.S. 199 (2007)..................................................................*passim*

*Lovett v. Ray*,
    327 F.3d 1181 (11th Cir. 2003) ..........................................................31

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019) ..........................................................41

*Marcum v. Zimmer*,
    163 F.R.D. 250 (S.D.W. Va. 1995) ....................................................43

*Moore v. Bennette*,
    517 F.3d 717 (4th Cir. 2008) ..............................................................29

*\*Parzyck v. Prison Health Servs., Inc.*,
    627 F.3d 1215 (11th Cir. 2010) ..................................................*passim*

*Pettaway v. Barber*,
    2022 WL 1087702 (M.D. Ala. Apr. 11, 2022)....................................43

*Ray v. Ford Motor Co.*,
   2011 WL 6440521 (M.D. Ala. Dec. 22, 2011).................................40

*Ross v. Blake*,
   578 U.S. 632 (2016).................................16

*Samara v. Taylor*,
   38 F.4th 141 (11th Cir. 2022) .................................18, 19

*Santiago v. Lykes Bros. S.S. Co.*,
   986 F.2d 423 (11th Cir. 1993) .................................19

*Sidney v. Equifax Info. Servs., LLC*,
   2021 WL 7708525 (N.D. Ga. Apr. 9, 2021).................................42

*Siggers v. Campbell*,
   652 F.3d 681 (6th Cir. 2011) .................................28

*Sims v. Apfel*,
   530 U.S. 103 (2000).................................33

*\*Sims v. Sec'y, Fla. Dep't of Corr.*,
   75 F.4th 1224 (11th Cir. 2023) .................................6, 17, 31, 32

*Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*,
   75 F.4th 1290 (11th Cir. 2023) .................................43

*Sosa v. Airprint Sys., Inc.*,
   133 F.3d 1417 (11th Cir. 1998) .................................14, 39, 44

*Torres v. Puerto Rico*,
   485 F.3d 5 (1st Cir. 2007).................................42

*Turley v. Rednour*,
   729 F.3d 645 (7th Cir. 2013) .................................27

*United States v. Barner*,
   572 F.3d 1239 (11th Cir. 2009) .................................44

*Woodford v. Ngo*,
   548 U.S. 81 (2006).................................20, 31, 34, 37

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & DeCamp,
LLP*,
2022 WL 17474765 (M.D. Fla. Apr. 6, 2022)....................................41

## Constitutional Provision

U.S. Const. amend. VIII..........................................................................4

## Statutes

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

42 U.S.C. § 1983 ............................................................................1, 4, 11

42 U.S.C. § 1997e(a)....................................................................1, 3, 5, 16

## Rules

Fed. R. Civ. P. 1 ...................................................................................43

Fed. R. Civ. P. 6(b)(1)(B) ....................................................................42

Fed. R. Civ. P. 12(c)..............................................................................41

Fed. R. Civ. P. 16(b)(4).....................................................................39, 42

M.D. Ga. L.R. 72.3 ...............................................................................40

## Other Authorities

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal
Texts* (2012) .....................................................................................42

Georgia Department of Corrections, Jenkins Correctional Facility,
accessed on July 10, 2024,
https://gdc.georgia.gov/locations/jenkins-correctional-facility ............8

## INTRODUCTION

In 2014, while incarcerated in a Georgia prison, Ricky Johnson lodged an administrative grievance complaining that prison medical staff were failing to treat his Hepatitis C, despite a prescription from a specialist.  "I was approved for medical treatment for Hepatitis C," wrote Johnson.  "I would like my treatment to begin immediately."  Doc. 144-3 at 13.  Two years later, with treatment still nowhere in sight but his condition much worse, Johnson sued.  His lawsuit raised the exact same issue as his grievance: the failure of Johnson's prison doctors to treat his Hepatitis C.

A Georgia jury recently found that two of these doctors violated Johnson's Eighth Amendment rights.  This appeal is about a third doctor, Appellee Kevin Marler, who watched Johnson's disease progress to Stage 4 but still failed to provide treatment.  Less than two weeks before trial, the district court dismissed Dr. Marler from this long-running case, concluding that Johnson failed to exhaust his administrative remedies.

The Prison Litigation Reform Act ("PLRA") requires prisoners like Johnson who sue under 42 U.S.C. § 1983 to first exhaust the prison system's administrative remedies.  *See* 42 U.S.C. § 1997e(a).  This exhaustion requirement reflects Congress's judgment of how best to balance efficient resolution of prisoner litigation with the right of prisoners to access federal courts.  As the Supreme Court confirmed in *Jones v. Bock*, federal courts have no role in altering Congress's balance by

layering additional procedural rules onto the exhaustion requirement.  *See* 549 U.S. 199, 217 (2007).

Johnson's grievance exhausted his administrative remedies, clearing the way for his lawsuit against Dr. Marler.  To be sure, the grievance did not mention Dr. Marler by name; indeed, at the time of his grievance, Johnson was not yet under the care of Dr. Marler.  But the PLRA did not require that Johnson's grievance name Dr. Marler or otherwise provide him with "personal notice."  *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010) (quoting *Jones*, 549 U.S. at 219).  Under this Court's precedent, a prisoner satisfies the exhaustion requirement so long as the person he is suing "contribute[d] to the continuation of a problem" that was "raised in an earlier grievance."  *Id.*  Here, Johnson's complaint clearly alleges that Dr. Marler contributed to the continuation of the same problem raised in his pre-suit grievance.

In failing to apply this binding caselaw, the district court grafted two new requirements onto the PLRA.  First, it said that too much time had lapsed between the resolution of Johnson's grievance and his lawsuit.  Second, it said that because Dr. Marler worked at a different prison than the one where Johnson lodged his grievance, Johnson should have submitted a new grievance after his transfer.  In other words, the district court ruled that Johnson's grievance was not sufficiently proximate—either temporally or physically—to his lawsuit.

2

But the PLRA says nothing about temporal or physical proximity. It requires only that a prisoner exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). Johnson did just that. The Georgia Department of Corrections ("GDC") has a single set of grievance procedures applicable to all prisoners in the GDC system. Those procedures have their own timeliness requirement, which Johnson indisputably satisfied. They also expressly provide that a prisoner may file a grievance at one prison about events at a different prison. The district court's layering of additional requirements on top of those in the plain text of the PLRA or the GDC's administrative procedures cannot be sustained. In fact, its temporal and physical proximity requirements are exactly the sort of judicially created "procedural rules" that the Supreme Court struck down in *Jones*. *See* 549 U.S. at 204.

In any event, the district court never should have allowed Dr. Marler to file this motion mere weeks before trial, long after the deadline for dispositive motions had passed. The court acknowledged that Dr. Marler had not been diligent in pursuing this issue, but nevertheless held that its discretion was "hamstrung" because, in the court's view, Federal Rule of Civil Procedure 12(c) *required* granting leave to file an out-of-time dispositive motion. But Rule 12(c) does not require a district court to set aside its scheduling orders to entertain a motion for judgment on the pleadings at any time a defendant wishes to raise the issue (and regardless of whether the issue had already been ruled upon and rejected, as here). The district

3

court's misreading of Rule 12(c) was a legal error that provides an independent ground for reversal.

## STATEMENT OF JURISDICTION

Johnson's Eighth Amendment claim against Dr. Marler arises under the laws of the United States. *See* 42 U.S.C. § 1983; U.S. Const. amend. VIII. Thus, the district court properly exercised subject matter jurisdiction under 28 U.S.C. § 1331.

On March 8, 2024, the district court entered final judgment dismissing Johnson's action against Dr. Marler. Doc. 324. Johnson timely noticed this appeal on April 5, Doc. 326, giving rise to this Court's jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in holding that Johnson did not exhaust his administrative remedies against Dr. Marler, even though Dr. Marler contributed to the continuation of a specific constitutional violation that was raised in Johnson's pre-suit grievance.

2.    Whether the district court erred in holding that Federal Rule of Civil Procedure 12(c) required granting Dr. Marler's motion for leave to file an out-of-time dispositive motion.

4

## STATEMENT OF THE CASE

### I.    Legal Background

"In an effort to address the large number of prisoner complaints filed in federal court," Congress passed the Prison Litigation Reform Act in 1995. *Jones*, 549 U.S. at 202. Among other reforms, the PLRA requires prisoners to "exhaust prison grievance procedures before filing suit." *Id.* The exhaustion requirement provides in full: "No action shall be brought with respect to prison conditions under [42 U.S.C. §1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a).

In the wake of the PLRA, federal courts across the country began "adopt[ing] several procedural rules designed to implement this exhaustion requirement." *Jones*, 549 U.S. at 202-03. One such requirement "permit[ted] suit only against defendants who were identified by the prisoner in his grievance." *Id.* at 203. The Supreme Court ultimately intervened, rejecting additional procedural rules as definitively "not required by the PLRA." *Id.* To the contrary, the Court explained, "crafting and imposing [such rules] exceeds the proper limits on the judicial role." *Id.* Thus when a prisoner has satisfied the plain requirements of the PLRA, no more is required; judges may not create new requirements that "lack[] a textual basis in the PLRA." *Jones*, 549 U.S. at 217.

5

In rejecting extra-textual procedural requirements, the Court acknowledged that many prisoner cases "have no merit." *Id.* at 203. "Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law." *Id.* Although procedural rules requiring "early notice to those who might later be sued" may have some advantages, notice to individual prison officials "has not been thought to be one of the leading purposes of the exhaustion requirement." *Id.* at 219. To the contrary, the purpose of exhaustion is to allow the prison system an opportunity to resolve complaints prior to suit, potentially "reducing litigation to the extent complaints are satisfactorily resolved." *Id.*

Precisely because the exhaustion requirement is aimed at allowing prisons to "address complaints," a prisoner need only "complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218, 219. As this Court has explained, "[t]hose requirements are defined by the prison grievance process itself." *Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224, 1230 (11th Cir. 2023). So long as a prisoner follows the "requirements of the applicable prison grievance system," he may "initiate a lawsuit." *Id.* "[A] prisoner need not do anything else." *Id.*

6

## II.    Factual Background

### A.    Johnson Grieves The Failure To Treat His Hepatitis C.

Appellant Ricky Johnson is a prisoner in the custody of the Georgia Department of Corrections.  In 2009, shortly after he began serving his sentence, Johnson was diagnosed with Hepatitis C, a blood-borne disease caused by the Hepatitis C virus ("HCV").  Doc. 1 at 4; Doc. 144-4 at 30.  HCV primarily affects the liver by causing inflammation, which leads to scarring known as fibrosis.  Doc. 144-1 ¶¶ 21-22; Doc. 144-4 at 4.  Eventually, fibrosis can lead to cirrhosis and permanent liver damage.  Doc. 144-3 at 25-26, 35.

Several years after Johnson was diagnosed, a prison gastroenterologist ordered a liver biopsy.  Doc. 144-4 at 37.  That biopsy showed that Johnson's HCV was worsening.  *Id.* at 70 (showing Grade 2 inflammatory activity).  Based on the biopsy results, the gastroenterologist prescribed treatment in April 2013.  *Id.* at 48.  At the time of this prescription, Johnson was under the care of Dr. Thomas Ferrell at Ware State Prison.

But treatment did not come for five years.  Over a year after his prescription, Johnson's HCV had progressed, with blood enzyme levels well outside the normal range.  *Id.* at 72.  Concerned that prison medical staff were ignoring his condition, Johnson lodged a formal grievance:

> I was approved for medical treatment for Hepatitis C.…  I submit that medical staff is being deliberately indifferent to a serious medical need

7

in violation of my 8th Amendment right against cruel & unusual punishment. I would like my treatment to begin immediately.

Doc. 144-3 at 13.

The warden denied Johnson's grievance, falsely asserting that he had never requested treatment. *Id.* at 20. Johnson appealed this denial to Dr. Sharon Lewis, GDC's Statewide Medical Director. *Id.* at 21. Johnson explained that he had made "numerous requests" for treatment. *Id.* These requests dated to at least January 2012, when Johnson's physician had written, "HE HAS HCV AND WANTS TREATMENT." Doc. 144-4 at 36. Nonetheless, Dr. Lewis denied Johnson's appeal, stating that "medical personnel handled this case appropriately" and "no further action is warranted." Doc. 144-3 at 22.

## B. Dr. Marler Continues To Deny Treatment.

In 2015, GDC transferred Johnson to Jenkins Correctional Facility. Doc. 144-4 at 24. Johnson was serving the same sentence for the same offense. And Jenkins, like Ware, is part of the GDC prison system,[1] though Jenkins is privately operated by CoreCivic, Inc. At Jenkins, Johnson found himself under the exclusive care of Dr. Kevin Marler, Jenkins's Medical Director. Doc. 157 ¶ 2.

---

[1] *See* Georgia Department of Corrections, Jenkins Correctional Facility, accessed on July 10, 2024, https://gdc.georgia.gov/locations/jenkins-correctional-facility.

Immediately after his transfer, Johnson asked Dr. Marler when he could expect to receive the treatment for his HCV that he had been prescribed by the specialist over two years earlier. Doc. 1 at 6. Dr. Marler responded that CoreCivic does not provide HCV treatment. *Id.* Johnson's disease then progressed and began to cause physical symptoms, with his blood enzyme levels worsening. Doc. 157-1 at 32. Dr. Marler wrote in his contemporaneous medical notes that Johnson had developed "scattered, red papular lesions on the extremities." Doc. 157 ¶ 6. In addition, Johnson suffered frequent bouts of nausea and vomiting and had become lethargic. Doc. 158 ¶¶ 24, 26. Unimpressed, Dr. Marler called Johnson's HCV "quiescent" (*i.e.*, inactive or dormant). Doc. 158-3 at 26.

On April 20, 2017, Dr. Lewis, GDC's Statewide Medical Director, reminded Dr. Marler that GDC had added a new diagnostic test, called FibroSure, to its HCV protocol. Doc. 157 ¶ 10. Dr. Marler finally administered this test to Johnson in early June 2017. Doc. 158-3 at 27.

Johnson met with Dr. Marler on June 12 to discuss the FibroSure test results. At that point, it had been nearly *five years* since Johnson's biopsy. Following years of progressively worsening bloodwork and increasingly severe symptoms, the test confirmed Johnson's worst fears: Stage 4 fibrosis with cirrhosis of the liver. Doc. 157-1 at 16. The finding of Stage 4 fibrosis meant that Johnson's disease had already done permanent damage to his liver. Doc. 144-3 at 26. To make matters worse, the

9

test also showed that Johnson's disease was at Grade 3, meaning that it was rapidly advancing.

Dr. Marler was deliberately indifferent to this serious diagnosis. *First*, after explaining these disturbing test results, Dr. Marler informed Johnson that he *still* would not receive treatment. Doc. 158 ¶ 33. Consistent with that position, Dr. Marler did nothing for an entire month after the visit. Not until July 11, 2017, after he was served with Johnson's lawsuit, did Dr. Marler begin the necessary paperwork to treat Johnson. Doc. 158-3 at 34; Doc. 12 at 1 (process receipt). And Dr. Marler did not even complete his notes from the June 12 appointment until July 12—again, after he had been served with Johnson's suit. Doc. 158-3 at 30-33.

To top it off, Dr. Marler downplayed the seriousness of Johnson's condition. In his July 12 notes, Dr. Marler was prompted to assess the "degree of control" of Johnson's HCV (Good, Fair, or Poor) and his "status" (Improved, Stable, or Worsened). *Id.* at 30. Even though Johnson had just received a FibroSure result indicating severe and progressing cirrhosis, Dr. Marler selected "Good" and "Stable." *Id.*

On October 10, frustrated at the total lack of treatment nearly four months after his diagnosis of Stage 4 cirrhosis (not to mention the nearly five years since he had first received a prescription), Johnson filed another grievance. In this second grievance, Johnson asked (once more) to begin treatment. *Id.* at 38. The prison

denied Johnson's grievance without a word of explanation. *Id.* at 37. Two days later, citing an unexplained "Inmate on Staff Conflict," Johnson was transferred yet again to another CoreCivic prison, Coffee Correctional Facility. *Id.* at 4; Doc. 144-4 at 24.

In February 2018, several months after arriving at Coffee, Johnson finally received the HCV treatment that had been prescribed five years earlier. Doc. 101; Doc. 158 ¶ 46; Doc. 164 at 10.

## III.   Procedural History

On October 12, 2016—after having been denied his prescribed treatment for over three years—Johnson sued (as relevant here) Dr. Ferrell, Dr. Lewis, and Dr. Marler, raising Eighth Amendment claims under 42 U.S.C. § 1983. Doc. 1. Unlike Dr. Lewis and Dr. Ferrell, Dr. Marler did not move to dismiss. Doc. 34. Instead, he answered the complaint in August of the following year. Doc. 28.

After several years of pre-trial discovery and motions practice, the district court ordered all remaining dispositive motions to be filed by July 31, 2019. Doc. 142. Dr. Marler moved for summary judgment on numerous grounds, including that Johnson "did not exhaust his prison grievance remedy before filing the complaint." Doc. 145 at 7. To support his motion, Dr. Marler attached a sworn declaration, as well as an affidavit from Jenkins's Grievance Coordinator, Diane Hinton. Doc. 145-2. Before ruling on Dr. Marler's summary-judgment motion, the district court

ordered Dr. Marler to supplement the record because both his declaration and Ms. Hinton's affidavit had referenced documents that were not attached, violating Federal Rule of Civil Procedure 56(c)(1)(A). Doc. 153 at 6-7. In particular, Ms. Hinton's affidavit omitted GDC's standard operating procedures, a grievance filed by Johnson, and Johnson's appeal of that grievance. *See id*. Dr. Marler resubmitted the Hinton affidavit (this time in the form of a declaration), Doc. 154-1, and attached a copy of the standard operating procedures, Doc. 154-2, but still omitted Johnson's grievance history and copies of grievances and appeals that Johnson filed at Jenkins.

In October 2019, the magistrate judge rejected Marler's exhaustion defense, holding that he "ha[d] not met [his] burden of showing Plaintiff failed to exhaust." Doc. 171 at 33. Additionally, citing this Court's precedent, the magistrate judge noted that Johnson had previously filed a grievance and that "[a] prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim." *Id.* at 34 (quoting *Parzyck*, 627 F.3d at 1218). The magistrate judge found no dispute of material fact on the merits of Johnson's Eighth Amendment claims, however, and so he recommended dismissing Johnson's claims against all defendants. The district court adopted the magistrate's Order and Recommendation. Doc. 178. Johnson then appealed the grant of summary judgment to the defendants.

After appointing undersigned counsel to represent Johnson on appeal of the summary judgment, this Court reversed, holding that a reasonable jury could find

that each of the three defendants were deliberately indifferent to Johnson's HCV. *See Johnson v. Lewis*, 83 F.4th 1319 (11th Cir. 2023).  With respect to Dr. Marler, the Court ruled that his nearly two-year delay in performing a non-invasive liver diagnostic test, two-month delay between receiving Johnson's Stage 4 diagnosis and attempting to confirm the result with an ultrasound, and four-month delay between the ultrasound and Johnson leaving Dr. Marler's care—still without any treatment—each raised a genuine dispute of material fact about whether Dr. Marler provided Johnson with the constitutionally prescribed minimum standard of care.  *Id.* at 1330. The Court concluded that "[a] jury could well conclude that the lack of treatment Johnson received while under Dr. Marler's care reflects more than gross negligence." *Id.*

On remand, on December 30, 2023—years after the July 31, 2019 deadline for filing dispositive motions had passed—Dr. Marler moved for leave to file an out-of-time second dispositive motion pertaining to PLRA exhaustion, on the same basis that the magistrate judge had rejected back in 2019.  Doc. 224.  Johnson opposed this motion, arguing that Dr. Marler had not satisfied Federal Rule of Civil Procedure 16(b)(4)'s good-cause standard for modifying the case schedule to allow this out-of-time, duplicative dispositive motion.  Doc. 232.

The district court agreed with Johnson that Dr. Marler had not been "as diligent as he should have been."  Doc. 293 at 32.  Indeed, Dr. Marler did not make

any argument that he was diligent, *see generally* Doc. 224-1, despite the fact that

diligence is a prerequisite for "good cause" under Rule 16(b)(4), *see Sosa v. Airprint*

*Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998).  Nevertheless, the district court felt

that it was "hamstrung" by Rule 12(c), which compelled it to grant Dr. Marler leave

to file an out-of-time dispositive motion:

> I think Rule 12(c) gives them the chance to do this. I don't think it —
> I'm not happy about it.  I don't think that Dr. Marler was as diligent as
> he should have been in responding, et cetera, but I think Rule 12(c) does
> not preclude another motion.  I feel I'm hamstrung by the rules there on
> that.… I think the rules bind me up as far as Rule 12(c).

Doc. 293 at 32:1-12.

Shortly after granting Dr. Marler's motion for leave to file a new dispositive

motion, the district court granted Dr. Marler's now-restyled motion for judgment on

the pleadings.  Doc. 281.  The district court focused on the fact that Johnson's earlier

grievance did not name Dr. Marler, and thus Dr. Marler had no opportunity to

respond: "Plaintiff's grievance from Ware did not reference Defendant Marler

because he had not yet been under his care, and there is no evidence to suggest that

Defendant Marler had been given an opportunity to respond to Plaintiff's complaints

before he filed this lawsuit."  *Id.* at 11.  The court further emphasized that Johnson's

initial grievance, filed at Ware State Prison, "did not—and could not—address issues

at Jenkins because Plaintiff had yet to be transferred there."  *Id.*  The court

acknowledged "the common denominator—beginning treatment for Hepatitis C—

14

underlying both the Ware and Jenkins grievances remained the same," but it held that the Ware grievance did not address the continuation of a problem because "his grievance at Jenkins simply 'raised' different, more specific issues that his 'earlier grievance' from Ware didn't address." *Id.* at 12. As the court saw it, Johnson's grievance at Ware seeking HCV treatment differed from the post-suit grievance Johnson raised at Jenkins, in which he sought HCV treatment *and a consultation with a liver specialist. Id.* at 11-12 (comparing Doc. 1-1 with Doc. 240-8 at 15).

Ten days later, Johnson went to trial against the two remaining defendants, Dr. Ferrell and Dr. Lewis. After a three-day trial, the jury returned a verdict in Johnson's favor against both defendants, finding that both were deliberately indifferent to Johnson's HCV. Doc. 319. After the court entered final judgment against Dr. Ferrell and Dr. Lewis, Johnson appealed the district court's earlier dismissal of Dr. Marler.

## SUMMARY OF THE ARGUMENT

Johnson's 2014 grievance at Ware State Prison left no doubt about the issue he was raising ("I was approved for medical treatment for Hepatitis C. Medical staff refuses to begin treatment.") or the corrective action he wanted the prison to take ("I would like my treatment to begin immediately."). Doc. 1-1 at 1. In holding that this grievance did not exhaust his claim against Dr. Marler based on the exact same issue, the district court failed to apply binding precedent from this Court, impermissibly

layered new requirements onto the PLRA, and applied a "notice" requirement that the Supreme Court and this Court have decisively rejected.

*First*, Johnson's pre-suit grievance concerned the exact same issue that formed the basis of his later lawsuit against Dr. Marler: the unconstitutional denial of care for his HCV. In *Parzyck v. Prison Health Services*, this Court was clear that a prisoner satisfies the exhaustion requirement if the defendant "contribut[ed] to the continuation of a problem already raised in an earlier grievance." 627 F.3d at 1219. Johnson's grievance mirrored his complaint in all relevant respects and clearly satisfies *Parzyck*.

*Second*, in attempting to distinguish *Parzyck*, the district court grafted new requirements onto the PLRA. The statutory text required that Johnson exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). He did so here. It makes no difference that Johnson lodged his grievance while incarcerated at Ware and that Dr. Marler worked at Jenkins. Ware and Jenkins are part of the same GDC system, and both use the same GDC grievance procedures. The exact same administrative remedy was "available" at both institutions, and Johnson availed himself of that remedy while at Ware. Rather than apply the PLRA's plain text, the district court grafted temporal and physical proximity requirements onto the PLRA. But the Supreme Court has consistently "rejected every attempt to deviate … from [the PLRA's] textual mandate." *Ross v. Blake*, 578 U.S. 632, 639-40 (2016).

Nor did Johnson's grievance somehow fail to comply with GDC's internal grievance procedures. Taking its cue from the Supreme Court, this Court has been crystal clear that "the boundaries of proper exhaustion" are defined by "the requirements of the applicable prison grievance system." *Sims*, 75 F.4th at 1230. Yet GDC's procedures say nothing about temporal proximity between grievances and subsequent lawsuits. And the grievance procedures expressly contemplate that a prisoner might lodge a grievance in one prison that concerned conduct in another prison. The district court had no authority to layer new requirements on top of those imposed by GDC.

*Third*, it is legally irrelevant that Dr. Marler may not have had an opportunity to review Johnson's grievance. As this Court has explained, the purpose of the PLRA is "not to provide personal notice to a particular official that he may be sued." *Parzyck*, 627 F.3d at 1219 (quoting *Jones*, 549 U.S. at 219). For purposes of the PLRA, it is enough that Johnson's grievance gave "the agency"—here, GDC—"a chance to discover and correct its own errors." *Brown v. Sikes*, 212 F.3d 1205, 1208 (11th Cir. 2000).

Independent of the above errors, the district court's decision to grant Dr. Marler leave to file an out-of-time motion for judgment on the pleadings was an abuse of discretion. The district court expressly found that Dr. Marler had not been "as diligent as he should have been," Doc. 293 at 32:3-4, which should have doomed

17

the effort to raise the PLRA issue in an untimely motion.  But because the district court felt "hamstrung" by Federal Rule of Civil Procedure 12(c), it nevertheless granted Dr. Marler leave to file his motion.  As numerous courts have found, however, Rule 12(c) does not prevent district courts from enforcing earlier scheduling orders.  Because it granted Dr. Marler's motion for leave to file an out-of-time motion based on the incorrect belief that Federal Rules required doing so, the district court abused its discretion.

## STANDARD OF REVIEW

1.     This Court reviews *de novo* the district court's "interpretation and application" of the PLRA's exhaustion requirement.  *Dimanche v. Brown*, 783 F.3d 1204, 1210 (11th Cir. 2015).  When a defendant raises administrative exhaustion as a basis for dismissal, the defendant bears the burden of proving that the plaintiff did not exhaust administrative remedies.  *See Jones*, 549 U.S. at 216.  This means that the defendant not only has the burden of persuasion, but also the burden of producing evidence necessary to persuade the court.  *See Dixon v. United States*, 548 U.S. 1, 8 (2006).

A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Samara v. Taylor*, 38 F.4th 141, 152 (11th Cir. 2022).  In other words, the Court must "accept

the complaint's factual allegations as true and construe them in the light most favorable to the non-movant." *Id.*

2.      This Court reviews a district court's decision to modify or enforce a pre-trial scheduling order for abuse of discretion. *See Santiago v. Lykes Bros. S.S. Co.*, 986 F.2d 423, 427 (11th Cir. 1993). A district court "necessarily" abuses its discretion when it relies on "an erroneous view of the law." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## ARGUMENT

### I.      Johnson's Pre-Suit Grievance Exhausted His Administrative Remedies.

#### A.      Johnson's Complaint Against Dr. Marler Concerned The Same Issue That He Raised In His Pre-Suit Grievance.

Johnson exhausted his claim under the PLRA when he filed a pre-suit grievance at Ware about the denial of medical care for his HCV infection—the factual basis for his later lawsuit against Dr. Marler. Under this Court's precedent, Johnson was "not required to initiate another round of the administrative grievance process on the exact same issue" each time a different prison medical official denied treatment. *Parzyck*, 627 F.3d at 1219.

The relevant facts of *Parzyck* parallel Johnson's case. *Parzyck* concerned a Florida prisoner's allegation that he was repeatedly denied a consultation with an orthopedic specialist, in contradiction with the recommendation of prison medical staff. *Id.* at 1217. As is the case here, one of the defendants in *Parzyck*—Dr.

19

Cherry—did not participate in the prisoner's care until *after* the prisoner had lodged his administrative grievance. *Id.* at 1218. Dr. Cherry moved to dismiss, arguing that claims against him were not exhausted because the prisoner's grievance (1) did not explicitly refer to him and (2) concerned acts that occurred before he ever interacted with the prisoner. *See id.* at 1218-19.

This Court disagreed, reversing the district court's dismissal of Dr. Cherry. The Court held that the PLRA did not require the prisoner to specifically name Dr. Cherry in his grievance. *See id.* (citing *Brown*, 212 F.3d at 1207). This is because the exhaustion requirement "is designed 'to alert prison officials to a problem, not to provide personal notice to a *particular* official that he may be sued.'" *Id.* at 1219 (emphasis added) (quoting *Jones*, 549 U.S. at 219). The PLRA requires only that "there is 'time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)).

Neither did the Court find significance in the fact that Dr. Cherry was not involved in the prisoner's care at the time of his grievance. The district court had erroneously given weight to this factor, but this Court disagreed, cautioning against "confus[ing] the question of Dr. Cherry's liability on the merits of the claim with the separate and distinct question of whether Parzyck exhausted his administrative remedies." *Id.* at 1218. Because the prisoner's claim against Dr. Cherry was for his

"contribut[ion] to the continuation of a problem already raised in an earlier grievance," the claim had been exhausted under the PLRA. *Id.* at 1219

Under a straightforward application of *Parzyck*, Johnson's grievance exhausted his administrative remedies with respect to Dr. Marler. Johnson's grievance was based on the fact that prison medical staff refused to begin treating his HCV. In this lawsuit, Johnson alleges that Dr. Marler contributed to the continuation of this problem after GDC transferred him to Jenkins. Specifically, Johnson alleges that Dr. Marler sat idle thrice over as Johnson's HCV progressed to Stage 4 with cirrhosis. First, Dr. Marler ignored a specialist's recommendation to conduct a repeat biopsy. Second, once Dr. Marler learned that Johnson's HCV had progressed to Stage 4, he did nothing (not even basic paperwork) for a full month. Finally, even after starting paperwork, Dr. Marler failed to secure Johnson treatment for another four months (after which time Johnson was transferred out of Marler's care). *See Johnson*, 83 F.4th at 1330 (holding that a reasonable jury could find that Dr. Marler was deliberately indifferent on any of Johnson's three theories). Each of these theories of liability comfortably fall within the ambit of Johnson's grievance.

The district court acknowledged that "the common denominator—beginning treatment for Hepatitis C—underlying both the Ware and Jenkins grievances remained the same," Doc. 281 at 12, but it nevertheless concluded that Johnson "did not request the same relief at both facilities." Doc. 281 at 17. In support of that

conclusion, the district court invoked two purported "significant and substantial differences" between Johnson's pre-suit grievance, lodged at Ware, and a later, post-suit grievance, lodged at Jenkins.  *Id.* at 12.  First, unlike the pre-suit grievance, which made no mention of any medical monitoring conducted by prison medical staff, Johnson's second grievance acknowledged that staff at Jenkins had been "conducting blood tests and monitoring."  *Id.* at 11 (quoting Doc. 240-8 at 15). Second, in addition to seeking treatment for his HCV, Johnson's post-suit grievance also sought consultation with a specialist.  *See id.* at 11-12 (citing Doc. 240-8 at 15). According to the district court, these features of the post-suit grievance made it "a far cry from the general request to begin treatment" in Johnson's pre-suit grievance. *Id.* at 12.

This holding cannot be sustained on the law or the facts.  To start, the district court compared the wrong documents.  Rather than comparing Johnson's two grievances, the court should have compared Johnson's pre-suit grievance with his complaint.  This is because the legal question is whether the pre-suit grievance exhausted the claims raised in Johnson's lawsuit, not whether the grievance raised issues identical to those raised in a subsequent grievance.  Put simply, if Johnson's pre-suit grievance pertained to the same issues raised in his complaint, the PLRA allows this lawsuit to go forward, no matter what grievances Johnson later filed.

And even if the facts underlying Johnson's post-suit grievance were somehow relevant, the district court misapprehended their significance. Johnson's acknowledgement that medical staff at Jenkins had been conducting blood tests does not change the fact that nobody in the GDC—including Dr. Marler—ever treated him for his HCV. The district court equated blood monitoring with treatment, *see id.* at 11, but Johnson was clear that he believed he was entitled to (and had been prescribed) drug therapy, not mere blood monitoring, and this Court has already concluded that a reasonable jury could side with Johnson, *see Johnson*, 83 F.4th at 1330. This denial of drug therapy for his HCV—a treatable condition—is exactly what formed the basis of Johnson's grievance.

A side-by-side comparison of Johnson's grievance and his complaint leaves little doubt that Johnson's pre-suit grievance raised "the exact same issue" as his complaint. *Parzyck*, 627 F.3d at 1219. This is true regardless of the level of generality at which the "issue" is conceptualized. As reflected in TABLE 1, the grievance closely tracks Johnson's complaint as it pertains to Dr. Marler: the same allegation that he was not receiving his prescribed treatment, a belief this failure-to-treat constituted deliberate indifference to his HCV, and a request for treatment to begin immediately. *Compare* Doc. 1-1, *with* Doc. 1.

23

| | Pre-Suit Grievance (Doc. 1-1) | Complaint (Doc. 1) |
|---|---|---|
| *Factual Basis* | "I was approved for medical treatment for Hepatitis C. Medical staff refuses to begin treatment …"  Doc. 1-1 at 1. | "Plaintiff informed Dr. Marler that treatment has already been prescribed."  Doc. 1 at 6.<br><br>"Dr. Marler informed Plaintiff that he would not receive the treatment for hepatitis C."  *Id.* at 7 |
| *Legal Violation* | "I submit that medical staff is being deliberately indifferent to a serious medical need in violation of my 8th Amendment right against cruel & unusual punishment."  Doc. 1-1 at 1. | "Hepatitis C is a viral infection that causes liver disease which results in cirrhosis …. This is a serious medical need …."  Doc. 1 at 7.<br><br>"[T]his failure constitutes deliberate indifference to a serious medical need in violation of the 8th Amendment."  *Id.* at 8. |
| *Requested Relief* | "I would like my treatment to begin immediately."  Doc. 1-1 at 1. | "I would like to receive my prescribed medical treatment."  Doc. 1 at 12. |

*Table 1. Comparison of Pre-Suit Grievance and Complaint*

Under *Parzyck*, Johnson "was not required to initiate another round of the administrative grievance process on the exact same issue."  627 F.3d at 1219.

*Parzyck* itself cited two sister-circuit decisions that further support this principle.  In *Howard v. Waide*, the Tenth Circuit held that a prisoner need not refile a grievance after an assault from a gang member "when the very risk to his safety that he identified during the grievance process came to pass."  534 F.3d 1227, 1244 (10th Cir. 2008).  The plaintiff in *Howard* had filed many grievances stating that he was at risk for assault from a prison gang in his housing division.  Those grievances

24

were denied, and the prisoner was later sexually assaulted by gang members.  *See id*. at 1233.  The defendant argued that the prisoner should have refiled his grievance after the assault in a new location.  *See id*.  But the Tenth Circuit disagreed, reasoning that "[g]iven the response to his first three grievances, further grievances complaining of the same living situation would have been redundant."  *Id*. at 1244.  Similarly, in *Johnson v. Johnson*, the Fifth Circuit held that a prisoner suffering from repeated sexual assaults "could not have been expected to file a new grievance" after each assault.  385 F.3d 503, 521 (5th Cir. 2004).  Once the prisoner completed the grievance process, his administrative burden did not begin anew simply because there was a "continuing failure" to protect the prisoner from harm.  *Id*.

*Howard* and *Johnson* underscore two principles.  *First*, when a prisoner lodges a grievance alleging a "continuing condition," the PLRA does not require the prisoner to file a new grievance every time a new prison official becomes involved.  Had Congress wished to impose such a requirement, it knew how to do so.  *Second*, that statutory scheme makes sense.  When the prison system denies a grievance, it is unreasonable to expect a prisoner to lodge successive grievances complaining of the same issue.  That is especially true when, as here, all grievances on the same topic are ultimately resolved by the same individual—here, Dr. Lewis, *see* Doc. 330 at 351:18-19.

25

Other courts of appeals have taken the same approach. The Second and Seventh Circuits have favorably cited *Parzyck* for the proposition that when a prisoner lodges a grievance complaining of a specific problem, a new grievance is unnecessary to properly exhaust claims related to the continuation of that problem. That does not change simply because new prison officials not involved at the time of the original grievance contribute to the continuation of the problem.

In *Johnson v. Killian*, the Second Circuit held that a prisoner need not file an additional grievance when a prisoner "identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit." 680 F.3d 234, 239 (2d Cir. 2012). *Killian* concerned a prisoner who lodged a grievance about a restriction on his congregational prayers. *Id.* at 236. Although the prison originally ceased enforcement of the policy, a new warden restarted enforcement two years later. *Id.* at 236-37. The prisoner immediately filed suit without filing an additional grievance, *id.* at 237, just as Johnson did when Dr. Marler denied him the prescribed treatment that had been denied by his previous doctor. The Second Circuit found that the original grievance "provided the prison administration with notice of, and an opportunity to resolve" the lack of prayer space and thus sufficiently exhausted administrative remedies. *Id.* at 238. This was true even though the new warden had nothing to do with the facts underlying the original grievance two years earlier. In sum, when a grievance and lawsuit address the same issue, the prison system has

26

received sufficient notice to correct the issue. *See id.* at 238-39. The difference in personnel or lapse in policy is irrelevant.

Likewise, the Seventh Circuit has emphasized that "prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). In *Turley*, a prisoner was subjected to repeat lockdowns over the course of several years—allegedly part of a scheme by prison union employees to negotiate a pay raise. *Id.* at 648-49. Although the prisoner did not discuss every lockdown in his grievance, the court reasoned that "once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.* at 650. The court said nothing about the need to notify any particular *official* of the grievance.

These courts are all aligned with *Parzyck*, and all confirm that the PLRA requires a prisoner to exhaust his administrative remedies for a continuing constitutional violation once and only once. If the constitutional violation continues—even with differences in personnel, policy, or location—the prisoner need not restart the grievance process at square one.

That basic principle requires reversal of the district court's order. Here, the five-year failure to treat Johnson's HCV is the prototypical "continuation" of a condition. Just as the prisoner in *Killian* need not have filed a new grievance under

27

a new warden when the underlying constitutional violation remained the same, Johnson did not need to lodge a new grievance re-addressing his inadequate medical care for HCV before filing suit. Dr. Marler's decision to sit idly by as Johnson's HCV progressed to Stage 4 directly contributed to the same constitutional violation already addressed by Johnson when he exhausted his administrative remedies at Ware.

Cases where a court of appeals has found that a prisoner's grievance did *not* exhaust the claim brought in a later lawsuit are readily distinguishable. Those cases, unlike this one, address fact patterns where the underlying complaints raise materially different issues than the grievance. In *Siggers v. Campbell*, for instance, the Sixth Circuit held that an inmate failed to exhaust his administrative remedies for all but one of his claims based on prison officials' interference with his mail. *See* 652 F.3d 681, 691-92 (6th Cir. 2011). The court reasoned that separate instances of mail interference did not indicate that the plaintiff was "suffering from one, continuing harm." *Id*. at 693. In fact, the Sixth Circuit expressly contrasted the plaintiff's mail-interference case with cases—like Johnson's—that are based on "an *ongoing medical condition* and [a] claim that the state stood by and did nothing in the face of that ongoing condition." *Id.* at 692 (emphasis added).

The Fourth Circuit has likewise distinguished between claims based on a single medical diagnosis, like Johnson's HCV, and those based on multiple distinct

28

issues.  In *Moore v. Bennette*, it held that a prisoner failed to exhaust his administrative remedies for gout, despite previously filing a grievance about Hepatitis C.  517 F.3d 717, 728-29 (4th Cir. 2008).  Because the prisoner did not mention gout in the Hepatitis C grievance, the court determined there was not "a fair opportunity to address the alleged inadequate care."  *Id*. at 729.  In this case, however, Johnson's grievance and lawsuit both address his HCV diagnosis, avoiding entirely the issue of multiple diagnoses present in *Moore*.

In sum, numerous other circuits agree with *Parzyck*'s rule that an inmate satisfies the PLRA when his lawsuit alleges that a defendant "contribute[d] to the continuation of a problem already raised in an earlier grievance."  627 F.3d at 1219. And no circuit has found that a prisoner must "initiate another round of the administrative grievance process on the exact same issue."  *Id.*

## B.    The District Court Imposed New Requirements Not Present In Either The PLRA Or GDC's Policies.

Under the plain terms of the PLRA, the pre-suit grievance that Johnson lodged at Ware exhausted his claim against Dr. Marler.  In construing the phrase "administrative remedies," the Supreme Court has explained that "one 'exhausts' processes, not forms of relief."  *Booth v. Churner*, 532 U.S. 731, 739 (2001).  Both Ware and Jenkins are part of the GDC prison system, which has a *single grievance process*—the Standard Operating Procedures ("SOP")—applicable to "[a]ll offenders committed to the Department of Corrections in state prisons, private

29

prisons, county correctional institutions, and transitional centers." Doc 240-4 at 1.[2] Thus, the exact same administrative remedies were "available" at Ware and Jenkins. This is not a case where Johnson was transferred from a state to a federal facility, or where different prison systems offered different administrative remedies. Under the plain text of the PLRA and this Court's holding in *Parzyck*, Johnson was not required to exhaust the exact same administrative remedies twice for the same underlying issue—his lack of treatment for HCV.

The district court nevertheless found that Johnson's grievance did not satisfy the exhaustion requirement. Declining to apply *Parzyck*, the district court cited the length of time between the grievance and Johnson's lawsuit and the fact that the grievance was lodged from a different facility than the one in which Dr. Marler worked. *See* Doc. 281 at 12-13 (declining to apply this Court's precedent in *Parzyck* because "[t]he time and place" of Johnson's grievance were removed from the time and place of his complaint). In so doing, the district court imposed two new requirements: temporal proximity and physical proximity.

The PLRA, of course, does not say that administrative remedies must be exhausted *no more than one year before any action is brought*. Nor does it require

---

[2] The record contains two versions of GDC's SOP: the 2012 SOP, Doc. 240-4, and the 2015 SOP, Doc. 240-6. The two documents are extremely similar, but the 2012 SOP applies here because that was the document in force at the time of Johnson's pre-suit grievance.

that administrative remedies must be exhausted *at the correctional facility where each defendant is employed*.  These requirements are judicial creations with no basis in the statute's text.

Nor do these requirements have any basis in GDC's grievance SOP.  To be sure, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules."  *Woodford*, 548 U.S. at 88.  And those applicable procedural rules "are defined by the prison grievance process itself."  *Sims*, 75 F.4th at 1230.  Thus, courts "look to the requirements of the applicable prison grievance system to determine the boundaries of proper exhaustion."  *Id.*  Here, however, the SOP itself undermines the notion either that temporal or physical proximity are appropriate grounds for distinguishing this case from the Court's holding in *Parzyck*.

*First*, the SOP contains only one timeliness provision: a requirement that a grievance be filed "no later than 10 calendar days" from the date that a prisoner learns of the facts giving rise to the grievance.  Doc 240-4 at 7.  It says nothing about the proximity between a prisoner's grievance and a subsequent lawsuit.  Limitations on how long plaintiffs can wait before filing suit are set by statutes of limitation, not internal operating procedures.  In section 1983 suits such as this one, this Court applies Georgia's two-year personal injury statute of limitations.  *See Lovett v. Ray*, 327 F.3d 1181, 1182-83 (11th Cir. 2003).  So although the SOP in this case required

31

Johnson to lodge a grievance within ten days of complained-of conduct, and state law required Johnson to file suit within two years of an exhausted grievance, no law or administrative policy supports the district court's requirement that the grievance and lawsuit be proximate *to each other*.

*Second*, the SOP nowhere requires that a prisoner file a new grievance every time he is transferred to a new prison. To the contrary, the SOP expressly contemplates that a prisoner may file a grievance "in reference to a different facility." Doc. 240-4 at 13. Instead of "look[ing] to the requirements of the applicable prison grievance system to determine the boundaries of proper exhaustion," *Sims*, 75 F.4th at 1230, the district court roundly ignored GDC's SOP.

Because the district court imposed new requirements beyond those of the administrative system itself, its decision conflicts with the Supreme Court's decision in *Jones*, which struck down the Sixth Circuit's requirement that prisoners specifically reference future defendants in their grievances. "As [the Michigan Department of Corrections'] procedures *make no mention* of naming particular officials," *Jones* reasoned, "the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted." 549 U.S. at 218 (emphasis added).

The district court's decision to add new technical requirements to those imposed by the GDC itself is especially inappropriate given the non-adversarial

nature of the grievance process.[3]  In *Sims v. Apfel*, 530 U.S. 103 (2000) (plurality opinion), the Supreme Court rejected a similar attempt by the judiciary to superimpose additional exhaustion requirements on an inquisitorial administrative proceeding.  Writing for a four-Justice plurality in a case involving the denial of Social Security benefits, Justice Thomas explained that a judicially created issue-exhaustion requirement was especially inappropriate given the "informal, non-adversary manner" of the administrative proceedings.  *Id.* at 111 (citation omitted). Although *Apfel* concerned administrative exhaustion in a different context, the core lesson applies equally here: The judiciary should not impose extra-statutory exhaustion requirements on an informal administrative process in which it plays no role.

On top of that, the district court's requirements undermine the goals of the PLRA.  These two requirements *increase* the likelihood of suit—the exact opposite result of what Congress intended.  As the Supreme Court observed in *Jones*, a

---

[3] GDC's SOP clearly reflect an inquisitorial rather than adversarial system. GDC's grievance process begins with an "Original Grievance" filed within ten days and not exceeding one side of one page.  Doc. 240-4 at 7.  A staff member conducts interviews only if the grievance is initially accepted for review.  *Id.* at 8-9.  If the Original Grievance is denied, a prisoner may appeal.  *Id.* at 11.  But under no circumstance is a prisoner entitled to receive a formal hearing.  Such proceedings may promote administrative redress but cannot possibly function as an "analogy to normal adversarial litigation."  *Apfel*, 530 U.S. at 109.

proliferation of litigation would "not comport with the purpose of the PLRA to reduce the quantity of inmate suits." 549 U.S. at 223.

A new temporal-proximity requirement would incentivize prisoners to file lawsuits immediately after administrative exhaustion, directly increasing the quantity of suits in federal court. Savvy prisoners would be unwilling to risk giving prison officials time and opportunity to address their complaints. Forcing prisoners to choose between an immediate lawsuit or dismissal under an unwritten temporal-proximity requirement would therefore undermine the PLRA's attempt "to eliminate unwarranted federal-court interference with the administration of prisons, and thus … affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Goebert v. Lee County*, 510 F.3d 1312, 1322 (11th Cir. 2007) (alteration in original) (quoting *Woodford,* 548 U.S. at 93).

A physical proximity requirement would lead to equally undesirable results— indeed, it may even call into question the constitutionality of the administrative-exhaustion requirement. If a prisoner's grievance at one facility could never exhaust his administrative remedies at other facilities, then "[p]eriodic transfers would allow [prison officials] to effectively evade judicial review." *Johnson v. Fla. Dep't of Corr.*, 826 F. Supp. 2d at 1322-23. Prisoners would have a perverse incentive to

lodge grievances at the first whiff of conflict and to immediately refile all old grievances each time they are transferred to a new facility.

At bottom, the PLRA's exhaustion requirement seeks to provide the prison system an opportunity to resolve issues internally, *see Brown*, 212 F.3d at 1208, not to allow prison officials to evade judicial review by playing "hot potato" with inmates. This is not a hypothetical concern. Johnson has previously alleged that GDC officials have used frequent prison transfers to interfere with his right to secure treatment. *See* Doc. 95 ¶ 3 ("Instead of providing the prescribed treatment, Defendants began transferring Plaintiff to various high security level prisons such as Hays S.P. and Ware S.P."). Johnson's transfer history bears out this allegation: Johnson was transferred four times in less than five years, between December 4, 2012, and November 2, 2017 (Wilcox State Prison to Hays State Prison, Hays to Ware State Prison, Ware to Jenkins Correctional Facility, and Jenkins to Coffee Correctional Facility). Doc. 144-4 at 24-25. And, as of today, Johnson is in yet a different facility still: Riverbend Correctional Facility. The Court should not adopt a rule that so easily allows prison administrators to escape judicial review and interfere with the right of prisoners to access federal courts when their constitutional rights are being violated.

35

\*    \*    \*

All prisons within the GDC system offer the exact same administrative remedies. And any medical grievance filed by Johnson would have gone up to the same official—Dr. Lewis. By lodging his pre-suit grievance (and appealing its denial), Johnson exhausted his administrative remedies for all legal claims related to that grievance. The district court avoided this conclusion only by creating new requirements that have no basis in the PLRA's text or GDC's grievance SOP. Additionally, neither of these requirements can be squared with the PLRA's statutory scheme or purpose. A temporal-proximity requirement would further incentivize litigiousness and needlessly obscure the PLRA's "proper exhaustion" requirement. A physical-proximity requirement would contradict current GDC procedures and allow prisons to evade judicial review. The PLRA already creates stringent, clearly expressed requirements for administrative exhaustion. Additional "unwritten limits" only disrupt Congress's careful balance.

### C.    Johnson Was Not Required To Put Dr. Marler "On Notice."

The district court also expressed concern that Dr. Marler had no way to learn about Johnson's pre-suit grievance, and thus "there was no way for Defendant Marler to have been put on notice." Doc. 281 at 14-15. But as a unanimous Supreme Court said in *Jones*, and this Court repeated in *Parzyck*, the exhaustion requirement does not exist "to provide personal notice to a particular official that he may be

36

sued." *Parzyck*, 627 F.3d at 1219 (quoting *Jones*, 549 U.S. at 219). Instead, it requires that notice be given to the prison system as a whole so that there is "time and opportunity to address complaints internally." *Woodford*, 548 U.S. at 93 (citation omitted). Notice at the prison-system level furthers the objectives of exhaustion, which include allowing "*the agency* [to] develop the necessary factual background upon which decisions should be based," permitting "*the agency* to exercise its discretion or apply its expertise," improving "the efficiency of the administrative process," and giving "*the agency* a chance to discover and correct its own errors." *Brown*, 212 F.3d at 1208 (emphasis added). Thus, it matters not whether Dr. Marler was personally aware of the grievance or whether local files were transferred between Ware and Jenkins, but whether the GDC prison system as a whole was aware of Johnson's grievance and had an opportunity to respond.

In a case with similar facts, *Johnson v. Florida Department of Corrections*, the Northern District of Florida held that "[t]he reasoning in the *Parzyck* case is equally applicable" to grievances filed before an inmate is transferred to a new facility when a grievance reaches an individual with "the ultimate responsibility for grievances." 826 F. Supp. 2d at 1323. It reasoned that "[a]lthough individual institutions have some authority and discretion to resolve grievances, the ultimate responsibility for grievances like these lies with the Secretary." *Id.* at 1323-24. And

37

"[t]hat responsibility does not change regardless of when, where, and how often Mr. Johnson is transferred." *Id.* at 1324.

That same reasoning applies with full force here. Johnson's grievance indisputably put GDC on notice that Johnson was being denied his prescribed treatment. Again, all medical grievances in the GDC system fall under the responsibility of the same high-ranking GDC official, Dr. Lewis. *See* Doc. 330 at 351:18-19 (statement of Dr. Lewis that if a grievance appeal is "healthcare related, then it's going to come to the Office of Health Services, meaning me"). And Dr. Lewis actually responded directly to Johnson's grievance, stating her view that "medical personnel handled this case appropriately" and "no further action is warranted." Doc. 144-3 at 22. Thus, there is no doubt that "the agency"—GDC—had ample opportunity "to discover and correct its own errors." *Brown*, 212 F.3d at 1208. The PLRA did not require Johnson to do anything more.

## II.    The District Court Abused Its Discretion By Granting Dr. Marler's Motion For Leave Based On An Erroneous Understanding of Rule 12(c).

Separate and apart from its error in granting Dr. Marler's motion for judgment on the pleadings, the district court abused its discretion by granting Dr. Marler leave to file his motion in the first place. *See* Doc. 224 (Dr. Marler's motion for leave to file an out-of-time dispositive motion); Doc. 236 (Order granting motion for leave). Dr. Marler filed his motion for leave in 2023, *years* after the dispositive motion deadline passed in 2019, without a word explaining why he was diligent in filing his

motion. The district court was well within its discretion to deny Dr. Marler's untimely motion. Here, however, the district court erroneously believed that it *lacked* discretion to enforce an earlier scheduling order against Dr. Marler. Because it granted Dr. Marler's motion for leave to file an out-of-time dispositive motion based on the erroneous belief that Federal Rule of Civil Procedure 12(c) *required* doing so, the district court abused its discretion.

District courts possess inherent authority to control their own dockets and set scheduling orders in the cases before them. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) (emphasizing that a district court has "power to control its own docket"); *see also Chudasama v. Mazda Motor Corp*., 123 F.3d 1353, 1366 (11th Cir. 1997) (noting that the district court's authority includes "broad discretion in deciding how best to manage the cases before [it]"). Without the discretion to set case schedules, a district court could not "achieve the orderly and expeditious disposition of cases." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). Once set, a scheduling order may be modified only for "good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Courts should not "render scheduling orders meaningless" by "read[ing] Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *See Sosa*, 133 F.3d at 1418.

Early in this litigation, the district court properly exercised its discretion to enter a case schedule, setting the dispositive-motions deadline for July 31, 2019.

39

Doc. 142.  The dispositive-motions deadline included motions for judgment on the pleadings under Rule 12(c).  Indeed, the Middle District of Georgia's Local Rules specify that a "motion … for judgment on the pleadings" is a "dispositive pretrial matter[]," M.D. Ga. L.R. 72.3, and district courts in this circuit have properly treated motions for judgment on the pleadings as dispositive.  *See, e.g.*, *Ray v. Ford Motor Co.*, 2011 WL 6440521, at *1 (M.D. Ala. Dec. 22, 2011) ("This court ordered … that all dispositive motions shall be filed no later than April 9, 2009.  A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is such a motion." (citation omitted)); *Hallmark Ins. v. Fannin*, 2018 WL 8929809, at *1 (N.D. Ga. Apr. 13, 2018) (calling a motion for judgment on the pleadings under Rule 12(c) a "dispositive motion[]").  Most importantly, here, Dr. Marler's motion *was* dispositive because it resulted in Dr. Marler's dismissal from the case.

Despite the clear case schedule, on December 30, 2023 (over four years past the deadline), Dr. Marler sought leave to file *another* dispositive motion.  Doc. 224.  In response, Johnson argued that Dr. Marler's motion for leave should be denied because Dr. Marler had not been diligent and therefore could not demonstrate the good cause required to file an untimely dispositive motion.  *See* Doc. 232 at 5-8.[4]

---

[4] Among other arguments, Johnson noted that Dr. Marler had two prior chances to enter into the record facts necessary to support his exhaustion argument.  *See* Doc. 142; Doc. 153.  And all evidence on which Dr. Marler relied was available to him when he filed his *first* motion based on Johnson's alleged failure to exhaust.

The district court granted Dr. Marler's motion for leave over this opposition.  Doc. 236.  Yet the district court did not do so because it found good cause or because it chose to exercise its discretion to modify the scheduling order.  Instead, the district court stated that it was "hamstrung by the rules" and was *required* to permit Dr. Marler leave to file a motion for judgment on the pleadings.  Doc. 293 at 32:1-6.

That decision was based on a legal error and was thus an abuse of discretion. A district court "necessarily" abuses its discretion when it relies on "an erroneous view of the law." *Cooter & Gell*, 496 U.S. at 405; *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019) ("An error of law is an abuse of discretion *per se*." (citation omitted)).  By misapprehending Rule 12(c) as an inexorable command to allow all motions for judgment on the pleading, the district court relied on an erroneous view of the law.

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  As numerous courts have ruled, the statement that a party "may move for judgment on the pleadings" does not remove a court's innate ability to control its

---

*See* Doc. 232 at 11-12.  A litigant like Dr. Marler cannot be said to have been diligent if the evidence was available to him at the time of his original motion. *See id.* at 8-9 (citing *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & DeCamp, LLP*, 2022 WL 17474765, at *1 (M.D. Fla. Apr. 6, 2022)).

own docket with scheduling orders.  *See*, *e.g.*, *Torres v. Puerto Rico*, 485 F.3d 5, 8 (1st Cir. 2007) (affirming district court's decision to deny a motion under 12(c) because the "filing occurred well beyond the court-appointed deadline for the filing of dispositive motions"); *Christmas v. Corizon Health Servs*., 2021 WL 1821537, at *1 (M.D. Fla. Mar. 29, 2021) (denying a motion under Rule 12(c) because the dispositive motion deadline had "long passed"); *Sidney v. Equifax Info. Servs., LLC*, 2021 WL 7708525, at *1 (N.D. Ga. Apr. 9, 2021) (denying leave to file a motion under Rule 12(c) nearly three months after the deadline for such motions), *report and recommendation adopted*, 2021 WL 7708527 (N.D. Ga. May 3, 2021).

In addition to undermining the ability of district courts to manage their own dockets, a contrary interpretation of Rule 12(c) would create unnecessary conflict with other provisions in the Federal Rules.  Rule 16, for instance, provides that a district court may modify a case schedule "*only* for good cause *and* with the judge's consent." Fed. R. Civ. P. 16(b)(4) (emphasis added).  And Rule 6 specifies that when a deadline in a case schedule has already expired, the party seeking to modify the deadline must also show "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B).  The Court should not adopt an interpretation of Rule 12(c) that needlessly puts that Rule in conflict with Rule 16 and Rule 6.  *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

Any remaining doubt about whether the Federal Rules give district courts discretion to deny out-of-time motions under Rule 12(c) is resolved by Rule 1, which states that the Federal Rules of Civil Procedures should be "construed … by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. As courts around the country have recognized, a district court's ability to set and enforce scheduling orders is a crucial part of its ability to fulfill Rule 1's mandate. *See*, *e.g.*, *Fair Isaac Corp. v. Fed. Ins.*, 2022 WL 1537957, at *2 (D. Minn. May 16, 2022) ("Adherence to the deadlines in a pretrial scheduling order are critical to achieving the primary goal of the judiciary: to serve the just, speedy, and inexpensive determination of every action." (internal quotation marks and citation omitted)); *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D.W. Va. 1995) ("[A] scheduling order is the critical path chosen by the trial judge and the parties to fulfill the mandate of Rule 1."); *Pettaway v. Barber*, 2022 WL 1087702, at *3 (M.D. Ala. Apr. 11, 2022) (similar).

The district court's legal error was not harmless because the final judgment was "substantially swayed by the error." *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1309 (11th Cir. 2023) (citation omitted). Indeed, the hearing transcript reflects the dispositive role the district court's reading of Rule 12(c) played:

43

I don't think that Dr. Marler was as diligent as he should have been in responding, et cetera, but I think Rule 12(c) does not preclude another motion. I feel I'm hamstrung by the rules there on that.… I think the rules bind me up as far as Rule 12(c).

Doc. 293 at 32:1-12.

Under a proper interpretation of Rule 12(c), the court's observation that Dr. Marler was not diligent, *see* Doc. 293 at 32, should have ended the inquiry. *See Sosa,* 133 F.3d at 1418 (noting that good cause requires "the diligence of the party seeking the extension" (citation omitted)). The court nevertheless granted leave to file based on its erroneous interpretation of Rule 12(c).

This Court routinely vacates decisions where the lower court misapplies a legal standard. For example, when a district court misapplies a procedural rule under the Sentencing Guidelines, the decision must be vacated even if the outcome is otherwise reasonable. *See United States v. Barner*, 572 F.3d 1239, 1251 (11th Cir. 2009); *Gall v. United States,* 552 U.S. 38, 51 (2007) ("[r]egardless of whether the sentence imposed is inside or outside the Guidelines range" the court of appeals "must first ensure that the district court committed no significant procedural error, such as … selecting a sentence based on clearly erroneous facts"). This case is no different. The district court's abuse of discretion in granting Dr. Marler's motion for leave provides an independent basis to vacate the judgment below.

44

## CONCLUSION

Because Johnson exhausted his administrative remedies, this Court should reverse the dismissal of Johnson's claim against Dr. Marler and remand for a trial on the merits.  In the alternative, because the district court granted Dr. Marler's motion for leave based on an incorrect understanding of Rule 12(c), the Court should vacate that order.

Respectfully submitted,

MANOJ S. VARGHESE
JEFFREY W. CHEN
AMANDA D. BRADLEY
BONDURANT MIXSON &
ELMORE, LLP
1201 West Peachtree Street N.W.
Suite 3900
Atlanta, GA 30309
(404) 881-4100

/s/ Jordan L. Greene
KASDIN M. MITCHELL
JORDAN L. GREENE
 *Counsel of Record*
GABRIELLE DURLING
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
jordan.greene@kirkland.com

*Counsel for Plaintiff-Appellant*

July 11, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,577 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

July 11, 2024

*/s/* Jordan L. Greene
Jordan L. Greene

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/* Jordan L. Greene
Jordan L. Greene